526 P.2d 1056

**William J. RAGER, Appellant,**

v.

**SUPERIOR COACH SALES AND SERVICE OF ARIZONA, a corporation, and Automotive Sales Company, a corporation, Appellees.**

**No. 11080–PR.**

Supreme Court of Arizona, In Division.

Sept. 30, 1974.

See also 110 Ariz. 188, 516 P.2d 324.

Carson, Messinger, Elliott, Laughlin & Ragan by Robert W. Holland, Phoenix, for appellant.

Udall, Shumway, Blackhurst, Allen, Bentley & Lyons by John H. Lyons, Mesa, for appellee Superior Coach Sales.

Daughton, Feinstein & Wilson by Donald Daughton, Phoenix, for appellee Automotive Sales Co.

CAMERON, Vice Chief Justice.

This is an appeal by the plaintiff from the granting of a motion for directed verdict at the close of the plaintiff's case in favor of the defendant Automotive Sales Company, and from the granting of a motion for directed verdict at the close of defendants' case in favor of the defendant Superior Coach Sales and Service of Arizona, Inc. The jury awarded the plaintiff a verdict against the defendant Wilson School District in the amount of $10,000 plus costs. This amount was paid in return for a covenant not to sue or execute. For procedural problems and questions concerning the effect of the covenant see Rager v. Superior Coach Sales and Service, 110 Ariz. 188, 516 P.2d 324 (1973).

Admitting the truth of whatever competent evidence the opposing party has introduced, including reasonable inferences therefrom, E. L. Jones Construction Company v. Noland, 105 Ariz. 446, 466 P.2d 740 (1970), and viewing these facts and reasonable inferences therefrom in a light most favorable to the party against whom the directed verdict was granted, the appellant in this case, Hlavaty v. Song, 107 Ariz. 606, 491 P.2d 460 (1971); Brand v. J. H. Rose Trucking Co., 102 Ariz. 201, 427 P.2d 519 (1967), we must answer the following questions on appeal:

1. Was there a prima facie showing of negligence on the part of Automotive Sales Company?

2. Could Superior Coach Sales and Service of Arizona delegate its responsibility for repairing the brakes to Automotive Sales Company?

The record indicates that Wilson School District No. 7 located in Maricopa County, Phoenix, Arizona, pursuant to bid, obtained delivery in February of 1968 the school bus in question. Superior Coach Sales and Service of Arizona provided the following warranty:

"The Superior Coach Sales & Service, Inc. of 2928 E. Washington St. extends the following Warranty and Service Policy on the Bus Equipment quoted in this bid. Three (3) years or 50,000 miles, whichever appears first. All parts and Labor if needed on a no charge basis to the School. Normal wear and tear and regular maintenance servicing are the Schools responsibility. Warranty Policy does not include wrecks, lack of proper maintenance, abusive use, over loading, or any act of God, floods and etc. The Bus has a 2500, 5000, and 10,000 Service and regular new equipment servicing."

At the time the bus was delivered, it contained three braking systems. One was an airbrake system otherwise known as a service brake system operated by a brake foot pedal. The second was a parking brake system independent of the service brake system. In addition to these two systems, there was, though not required by the specifications, a spring brake system designed to be automatically activated whenever the air pressure fell below a certain minimum.

In May of 1969 Wilson School District No. 7 brought the bus in question into Superior Coach Sales and Service of Arizona for repair of a defective leaking brake valve on the dashboard. Superior Coach Sales referred the bus to Automotive Sales for work on the brake. Mr. Gulley of Superior Coach testified that his verbal instructions to Automotive Sales were to check the brakes and "do whatever is necessary." Automotive Sales replaced a worn airline from the frame to the right rear brake chamber, replaced bolts which fasten the rear brake chamber to the vehicle, and checked the system for leaks. The mechanic who repaired the bus for Automotive Sales personally disliked the automatic spring brake systems. Therefore while working on the bus he elected to replace the emergency dash control valve, taking out a pressure line resulting in a spring brake system which could only function when the valve on the dashboard of the bus was pulled by the driver. Thus when the air pressure fell below the point at which the brake would not respond to the brake foot pedal, the driver would have

to manually pull the control valve on the dashboard before the spring brake system could be activated. The mechanic testified:

"Q Okay. Do you know, Mr. Giebner, whether this brake valve, the 275175 BW Valve is a manual or an automatic valve?

"A It's a manual valve.

"Q Do you know whether the—do you know what kind of a valve was on the bus when it came in?

"A It was a Berg.

"Q A Berg valve, is that right?

"A Yes, that's right.

"Q Was it a manual or an automatic?

"A Automatic.

"Q It was automatic, is that right?

"A That's right.

"Q Does the installation of a manual valve in place of the automatic valve—strike that.

How did you determine to replace an automatic valve with a manual one on this bus?

"A I don't know that.

"Q Did anybody tell you to put on a manual valve instead?

"A No, nobody told me.

"Q Nobody told you to?

"A Nobody told me.

"Q You made that as a matter of your own determination or your own election, is that right?

"A That's right.

"Q Why did you make that choice, Mr. Giebner?

"A Well, one thing, when the bus was brought in there, I was told a couple of different time those brakes came on automatically, going down the highway, or street.

"Q Who told you that, do you remember?

"A Ray Vasquez.

"Q Ray Vasquez, an employee of Wilson School District?

"A Yes.

"Q Did he tell you that it come on more than one time before?

"A He said a couple of times.

"Q What if anything was said further in that conversation between yourself and Mr. Vasquez?

"A I cannot remember the conversation.

"Q All right. Did you tell him that you would replace the automatic valve with a manual one?

"A I believe I did, yes.

"Q This conversation took place before you did the work?

"A As far as I know, yes.

"Q Do you remember whether anybody else was present when that conversation took place?

"A No, I do not.

"Q Isn't it true, Mr. Giebner, that in addition to this kind of a conversation you also personally dislike automatic spring brakes on buses?

"A That's right.

"Q And, your reason for it is what?

"A I believe a driver should have control over his spring brakes at all times.

"Q So, that if he doesn't want to apply them automatically—excuse me. If he does want to apply them under low air pressure conditions, that should be up to him, as far as you are concerned, is that right?

"A That's right.

"Q Did you discuss with anybody connected with the school district whether they liked the automatic feature of the bus?

"A I never talked to anyone from the school district.

"Q So, you then individually took the responsibility for changing the performance of this brake system, is that right?

"A That's right.

"Q Did you write down on the repairs ordered that you had changed the bus brake system somewhat?

"A No."

No one at Automotive Sales Company told the school district or Superior Coach that the brake system had been modified to eliminate its capacity to function automatically upon reduction of air pressure. The bill from Automotive Sales to Superior Coach, which was paid by Automotive Sales under Automotive's warranty agreement with Wilson School District, does not indicate that the automatic spring brake system valve had been replaced. The statement on the bill reads as follows:

"Labor: To check brake air system. Replace emergency relay valve Dash Control. Replace brake hose frame to axle. Repair air leaks. Replace bolts . . . bolt up right rear brake booster."

Ray Vasquez, mechanic for Wilson School District, testified as follows:

"Q Okay. Then, was the bus taken to the Automotive Truck Sales?

"A Yes, sir.

"Q Who by? Who did it, who took the bus there?

"A I took it, sir.

"Q Did Mr. Gulley tell you when he sent you over there, this Automotive Sales, what he wanted them to do to the bus?

"A I had talked to Mr. Gulley about this continuance in this air leak in the brake line and he told me since it was on a warranty, and all of this, that it would be best for a brake specialist to see it and he would talk to—he knew Automotive Truck Sales, they did some of his work, and he would talk to them on the phone and he instructed me to drive the bus over there and 'When you get over there, they will know what to do with it.' So, on orders from Mr. Gulley of Superior Coach, I drove this bus down to Automotive Truck Sales.

\* \* \* \* \* \*

"Q Did you discuss anything with the mechanics, or the service manager at Automotive Sales relative to the bus before any work was done at that shop?

"A No, sir.

\* \* \* \* \* \*

"Q When the bus was ready to be picked up, did you go over and pick it up?

"A Yes, sir.

"Q When you went over there, did you talk about the bus to anybody?

"A Well, they told me that the bus was ready. They told me that they had put a new valve, the main control valve."

And:

"Q MR. CRACCHIOLO: Mr. Vasquez, when this bus was first delivered to the Wilson School District, did you have any knowledge of how the emergency brake system worked in the event somebody was driving, the driver was driving and the air pressure went down?

"A No, sir.

"Q You had no idea.

You didn't know whether it went out automatically, or you had to pull it?

"A No, sir.

"Q You had no idea then how it worked after it was serviced by Automotive Truck Sales, is that right?

"A No, sir.

"Q Were you ever told by anyone at Automotive Sales that a different

kind of emergency system was put in this bus in May of 1969?

"A No, sir."

On the morning of 14 January 1970, the school bus was in operation and had operated properly that morning. As it approach the intersection of 24th Street and Washington in the city of Phoenix, approximately 50 feet from the intersection, the air brake foot pedal was depressed with the result of no air sensation on the foot brake. The driver testified:

"Q * * * How did you slow your bus down as you were approaching the light?

"A From a distance down Washington I could see that the light was going to change against me, so I let off on the gas and it was drifting up to a point of, I would say, 50 foot from the intersection. Then, I applied my brakes and nothing happened.

"Q All right. So, the first time you applied your brakes, after you left 32nd Street was within about 50 feet of the intersection, is that right?

"A Yes.

"Q And, at that time, you were going between 8 and 12 miles an hour?

"A Between 8 and 12, yes.

"Q Okay. Then, you have already testified, in detail, and I won't go over this again to any great extent; but, I think you said you first applied your foot brake twice, then you tried the emergency brake, then you tried the air horn and then you moved the gear shift lever into low gear, is that correct?

"A Right, right.

"Q And, you had done all of these things before you struck the first car, is that correct?

"A Right.

"Q All right. And, do you believe that if the emergency brake had come on at the time you pulled the valve, you would have been able to stop before the first impact?

"A Either that, or at the time, because if it acts as fast as the brake pedal does, that you ordinarily use, why then by throwing the complete air to it, it would immediately stop. The fact of the matter, it would have loosened the kids up in the seat.

"Q It comes to a very sudden stop?

"A Right, yes.

"Q And, at a speed of 8 to 12 miles an hour you are almost going to stop on a dime, so to speak?

"A Right."

The driver, concluding that a collision was inevitable, elected to change lanes by turning the bus to his right in order to avoid striking any stationary objects which would endanger his passengers. An automobile occupied by a man named Earl was struck in the rear, spinning the Earl car forward into the intersection where it struck the vehicle of the plaintiff William Rager as it approached the intersection from the north.

Subsequent to the collision it was discovered that the service air brake system was impaired by a punctured diaphragm in the brake chamber at the right rear wheel, as the result of a screw coming loose in the system and following the line to the diaphragm. The testimony indicated that this was the cause of the loss of air but was indefinite as to when this occurred. Paul G. Young, a consulting engineer, testified as follows:

"Q * * * Mr. Young, having examined the unit in question and the diaphragm that was installed in it together with the screw and having seen the condition of those two cuts or tears in the diaphragm, do you have any opinion about whether those problems were of recent origin?

"A I cannot state that it happened two days prior to the accident, or two

weeks. But, I would certainly estimate that it was within, certainly, a few months prior to the time of the accident. Somewhere relatively close to the time of the accident."

Since the accident occurred in January of 1970 and the bus was in Automotive's shop during May of 1969, it had been over 7 months between the repairs and the accident. Shortly after the accident, the brake system was inspected by the mechanic for Automotive Sales who had altered the spring brake system from automatic to manual and by some other experts as well. There was no evidence the bus' braking system had been altered between the time Automotive Sales had repaired the bus and the accident.

### WAS THERE NEGLIGENCE?

Our Court of Appeals has stated:

"The elements of a cause of action for negligence are well established in Arizona. The three elements necessary for a case of actionable negligence are as follows:

1. There must exist a duty on the part of the defendant to protect the plaintiff from the injury of which he complains;

2. The defendant must fail to perform that duty; and

3. An injury to the plaintiff must proximately result from such failure. (citation omitted)" Hersey v. Salt River Valley Water Users' Ass'n, 10 Ariz.App. 321, 323, 458 P.2d 525, 527 (1969).

■ Whether or not there is a duty on the part of the defendant to protect the plaintiff from the injury of which he complains is based on foreseeability. City of Scottsdale v. Kokaska, 17 Ariz.App. 120, 495 P.2d 1327 (1972). "Negligence is based on foreseeability." Boozer v. Arizona Country Club, 102 Ariz. 544, 547, 434 P.2d 630, 633 (1968). A review of the facts in a light most favorable to the plaintiff leads to the conclusion that it was foreseeable that person might be injured as the result of the driver of the school bus

relying on the original automatic braking system. Such foreseeable risk of harm created a duty on the part of the mechanic for Automotive Sales to notify the authorities of Wilson School District of the change in the braking system. Based upon the facts before us, we cannot say that negligence in this case is based upon the replacement of the brake itself standing alone. We can say, however, that the replacement of the automatic braking device coupled with the failure to properly notify the people of the change made in the braking system of the bus was a breach of duty owed to Wilson School District for the protection not only of Wilson School District and the pupils riding the bus, but to third parties such as plaintiff. Had the driver known that the spring brake was not activated automatically with the loss of air pressure, it is reasonable to believe that he may have acted differently. We have no difficulty then in finding that there was sufficient evidence that such breach of duty was the proximate cause of the injuries sustained by the plaintiff.

We believe, then, that the trial court erred in granting a directed verdict at the close of the plaintiff's case to Automotive Sales.

Because the mechanic at Automotive Sales did not inspect the brake drums in each wheel at the time the bus was in the shop, it is the contention of the plaintiff that this also was actionable negligence assuming that inspection of the wheels would have revealed the defect in the brake drum or at least sufficient evidence from which the jury could so find. While conceding that a duty to inspect each wheel may have existed, a reading of the record before us does not indicate that the plaintiff has shown that had the wheels been inspected at the time the bus was in the shop the defective diaphragm would have been discovered. To the contrary, the testimony of the consulting engineer indicated that this was of more recent origin and less than the seven months between the time the bus was in the shop and the accident. We

therefore do not address ourselves to this contention of the plaintiff although on retrial the evidence may be presented which could make this an issue for the jury.

## DELEGATION OF RESPONSIBILITY

At the close of the evidence of both the plaintiff and the defendants Wilson School District and Superior Coach Sales, the trial court granted a directed verdict in favor of the defendant, Superior Coach Sales.

It was the contention of Superior Coach Sales that any negligence was the responsibility of Automotive Sales alone and not Superior Coach. We disagree.

 Service to the bus was performed under warranty by Superior Coach. Because repair of brakes on heavy vehicles is an undertaking which creates a high degree of risk of serious bodily harm, Nichols v. Baker, 101 Ariz. 151, 416 P.2d 584 (1966), we believe that this is a non-delegable duty and Superior Coach Sales having selected Automotive Sales to do this work, Superior Coach Sales must also respond in damages. We adopt Rule 423 of the Restatement of Torts Second which states as follows:

> "One who carries on an activity which threatens a grave risk of serious bodily harm or death unless the instrumentalities used are carefully constructed and maintained, and who employs an independent contractor to construct or maintain such instrumentalities, is subject to the same liability for physical harm caused by the negligence of the contractor in constructing or maintaining such instrumentalities as though the employer had himself done the work of construction or maintenance."

Motions for directed verdict are set aside and the matter remanded for new trial.

STRUCKMEYER and LOCKWOOD, JJ., concur.